HORACE L. WINSLOW CO. v. NATIONAL BOILER WASHING CO.

(District Court, N. D. Illinois, E. D.   December 21, 1914.)

PATENTS 328—VALIDITY AND INFRINGEMENT—APPARATUS FOR WASHING OUT AND REFILLING LOCOMOTIVE BOILERS.

The Gale patent, No. 831,337, for an apparatus for washing out and recharging locomotive boilers, which performs the successive functions of blowing out the water and steam from the boiler, using the blow-off water for washing out, and utilizing the blow-off steam for heating the feed water, while the means for performing each of such functions separately was old, regarded broadly as a solution of the general problem of maintaining the efficiency of the locomotive, discloses a true combination and patentable invention; also *held* infringed.

In Equity.   Suit by the Horace L. Winslow Company against the National Boiler Washing Company.   On final hearing.   Decree for complainant.

Appeal dismissed, —— C. C. A. ——, 226 Fed. 1022.

Fred Gerlach, of Chicago, Ill., for complainant.

Walter H. Chamberlin, of Chicago, Ill., for defendant.

GEIGER, District Judge.   Complainant, as owner of letters patent No. 831,337, issued September 18, 1906, to Gale, on apparatus for washing out and refilling locomotive boilers, charges defendant with infringement of the claims thereof, numbered 1 to 12, inclusive, 16, 19 to 28, inclusive, and 32 to 38, inclusive.

The Gale invention "relates," so the patentee states, "to roundhouse equipment, and more particularly to apparatus for washing out and recharging locomotive boilers," and among the objects to be accomplished are (a) utilizing the blow-off water for washing out a locomotive through which the identical water and its heat units are conserved; (b) to provide apparatus for supplying, at the roundhouse main, water for washout purposes at the desired temperature, thus dispensing with any necessity for mixing cold and hot water at the discharge connection; (c) the expeditious recharging of a locomotive; (d) apparatus for utilizing directly the blow-off steam to heat the feed water, whereby both steam and water, in connection with a superheater, may be supplied to a locomotive, rendering it fit for prompt re-engagement in service.

The apparatus may be better understood by first considering the method of operation as stated by the patentee in connection with the accompanying Figure 1, wherein the letter $Z$ $Z$ represent the locomotive boilers.

Figure 1 not copied.

"The locomotive to be washed is run into one of the stalls, and usually arrives there with about 75 to 150 pounds of steam pressure.   If the boiler is

in condition that it needs washing, a flexible pipe *17* is connected to the adjacent blow-off cock *18*, and, if desired, when the locomotive is equipped with a blow-off cock at each side like connections can be made at both cocks of the boiler to expedite the blowing-off operation. Pipe *22* will also be connected to the dome cock *23*. Blow-off cocks *18* and the proper valves *16* and valves *23* and *19* of the dome connection will then be opened. Under the pressure within the boiler the water and steam will be quickly blown off and into the blow-off main *10*. If desired, cock *23* can be left closed until the water has been blown off and then opened to provide exit for the blow-off steam. Obviously by blowing off the water through the cocks at the sides of the boiler and the steam through the dome connection the blowing-off operation will be completed in a very short period. From the blow-off main *10*, the blow-off steam and water pass by pipe *10'* to separator *37*, and thence the blow-off steam passes to the feed water heater and reservoir *A* to raise the temperature of the fresh feed water. The blow-off water passes from separator *37*, through pipe *39*, to reservoir *B*, where it is purified and passes in the chamber *b'* for the water used for washing out the boiler. The solids blown off from the boiler are deposited in chamber *b* of reservoir *B*. In this manner sufficient hot water for washing out the boiler is provided, since the amount of blow-off water in a locomotive boiler is usually more than sufficient for washing out a boiler.

"When the blowing-off operation is completed, cocks *23* and *16* are closed. A hose for washing out the boiler is then connected to pipe terminal *25*. Valves *28* to *28'* and *31* are then opened, when water supplied from tank *81* by force-pump *D* will pass from main *12*, through pipe *29* and the branch *25*, to the hose used for washing out the boiler. If desired, such a connection can be made at each side of the boiler, so two workmen can simultaneously wash out a boiler, which is desirable when a locomotive is to be kept out of service as little as possible. Manifestly the washing-out connection can be performed by the workman without any regulation on his part, because of the apparatus employed for automatically regulating the temperature of the washout water and by which it is always maintained at the desired temperature in the mixing tank *81*.

"When the boiler has been washed out, a hose connection *17* is connected to each of the branch pipes *25* on opposite sides of the locomotive, and the necessary valves are opened (*27* and *28* on one side and *32* and *28'* on the other) and conduct water from main *11* through pipes *24*, hose connections *17*, and the blow-off cocks *18* to the boiler. At the same time the filling operation can be expedited by opening valve *23'*, Fig. 7, so that water from main *11* will also pass to the boiler by the dome connection, (valve *23'*, coupling *20*, pipes *21*, *22*, and cock *23*). The water for refilling, as already described, is kept under sufficient pressure and at such temperature that when the boiler is filled there will be sufficient steam and pressure in the boiler to render the locomotive serviceable and in condition to leave the roundhouse under its own steam, without waiting to build up the fire in the firebox until the steam necessary to charge the boiler has been generated in the boiler.

"When the boiler has been filled, dome cock *23* and the blow-off cock *18* will be closed, and the dome connection and hose connection *17* will be disconnected from the boiler, whereupon the locomotive will be in condition for service. Manifestly, if desired, the boiler can be filled, not only from the dome and one side of the boiler, but connection can also be made of a hose *17* at each side of the boiler, so the superheated water will enter the boiler at three places. Such construction not only saves considerable time, but is of material advantage, because the superheated water and steam evolved on entry of the water into the boiler are distributed throughout different portions of the boiler, and the temperature of all portions of the boiler is evenly raised, so that fractures resulting from uneven expansion of the boiler walls and crown sheet are entirely avoided."

The patent embodies 33 claims, whereof 28 are involved in this suit. The plaintiff, however, treats certain of them as fundamental;

the remaining as containing ancillary or subordinate features of the combination. The fundamental claims so urged, are:

(1) Claim 11:

"In apparatus for washing out and recharging locomotive boilers, the combination of a reservoir for feed water, a reservoir for washing water, means for transferring the heat units of the blow-out steam to the water in the feed water reservoir, means for conducting the blow-off water to the reservoir for washing water, and a pipe for conducting the washing water to a washout connection."

As ancillary features to this, are urged claims 1, 2, and 6, which provide the elements for tempering the water blown off from the boilers which has been conserved after it leaves the blow-off reservoir; claim No. 12, which contains the means for filtering the blow-off water; claim 3, the means for maintenance of circulation in the washout main; claims 6, 7, 8, and 9 for regulation of mixture of hot blow-off water and cold water.

(2) Claims 19, 21, 22, and 24.

The general features herein contained are the claimed "means for automatic regulation of the temperature of the washout water, so washers cannot vary the temperature."

As ancillary features to these four claims are urged 20 and 23, for thermostatic control of the washout water; claims 25, 26, 27, 28, 35, and 38, relating to the "mixing box for the washing water under automatic control"; claims 32, 33, and 34, a tank for keeping constant pressure on the cold water to be applied to the mixing box; and claims 36 and 39, the use of the last-named tank for equalizing the pressure of hot and cold water, mixed as contemplated for washing water.

(3) Claim 16:

"In apparatus of the character described, the combination of a feed water supply, a feed water main and means connected to said main whereby circulation of the feed water in the main will be maintained."

The defendant challenges the patent as disclosing no invention, as being an aggregation of the prior art possessing no patentable novelty. Its consideration is based upon the fundamental claim that the patent structure consists of two units—(a) the washout unit; and (b) the refilling unit, whose respective elements have separate and distinct functions not in co-operative relation. Hence it is said that any claim of the patent which embodies both sets of elements, is bad.

Upon this fundamental ground defendant then proceeds to analyze the two alleged separate units, and contends that the "washout unit" consists of (a) the tank for receiving the blow-off water; (b) the conduit pipe for the locomotive boiler to the tank; (c) the conduit pipe for the blow-off water; (d) a cold water supply for tempering the washing water. The (1) pump with a fisher governor; (2) the reservoir for storing the mixed washing water; (3) the thermostatic control for the automatic mixture of hot and cold water; (4) the circulating line; and (5) the tank of equalizing pressure of the cold water, are conceded as auxiliaries in aid of the performance of the functions of the fundamental units. But with respect to each the contention is

that the elements are old—upon the references given—and that the patent is but a mechanical selection or aggregation. A like contention is made respecting the "refilling unit," which is said to consist of (1) the tank for the refilling water; (2) the pipe for conducting the steam to the refilling tank; (3) the pipe for conducting the refilling water to the locomotive boiler—to which there are added certain ancillaries such as automatic pump, the circulating line, etc.

Complainant readily concedes that, taken piecemeal, no single element of any claims was "discovered" by the patentee; that the blow-off tank, blow-off pipe, storage or mixing tanks for hot and cold water, thermostatic control, automatic pumps, and the like, are old to quite an extent in structures of the instant, certainly in the allied and other, arts. Its contentions that the patentee was the first to organize a structure producing new and greatly desired results, that the structure in suit was the first to present in combination elements not theretofore organized and placed into co-operative relation, resulting in distinct and far-reaching advance in the art, refer the present inquiry to the demands, as well as the state of, the art at the time the patent was issued.

The century's development of the steam locomotive in respect of size, power, cost, and exactions and stress of its service is, of course, known, without proof, and is properly taken as a basis for estimating the value of an improvement in the means of maintaining efficiency and to promote economy in maintenance. The operating of a locomotive is quite different from that of a stationary power plant, in that its presence in the highest state of efficiency is at all times demanded. The movement of trains, unlike the operation of a stationary boiler and engine, cannot be suspended. A locomotive out of commission demands that another be supplied. Therefore, as suggested by complainant, the problem of prevention of impaired service, and the speedy restoration of impaired to normal and efficient service, obviously calls to its solution a high order of skill and endeavor. If the problem be viewed as one involving efficient and serviceable condition of a locomotive boiler, the three steps to be taken are the "blowing off," the "washing," and "refilling" processes. Of course, these may be regarded as successive. A structure may have for its purpose the accomplishment of either one alone. But the broad purpose sought to be accomplished does not place any limitation upon the endeavors to incorporate the so-called units into a single structure, seeking thereby to discharge the various functions successively and co-operatively.

Herein, to my mind, is the error of defendant's contention that the structure in suit embodies two separate units discharging independent functions. No reason is perceived for regarding a structure or a claim as unitary, merely because it provides means for discharging a function which is to co-operate in combination with others to discharge a larger function or to accomplish a larger object of the function as a whole. That is to say, while it is entirely possible to regard the blowing off, the washing, or the refilling of boilers as separate problems, for which separate solutions may be offered, the larger

problem may equally well be taken to be the maintenance of efficiency in the locomotive through the co-operative discharge of these several functions, and no reason is perceived why, in the solution of that problem, there cannot be a conception of a structure or combination relating to these several functions—not perhaps in strict co-operation, but in succession; the one step serving as well for the discharge of a function as for the preparation or qualification, so to speak, for the discharge of the functions successively to be discharged. That, as I conceive, is just the combination here claimed. If, therefore, the "art" or "locomotive practice" to which the invention relates be considered broadly as above noted, there are certain factors to be taken into account in the solution of the general problem of maintaining efficiency. Among them are: The length of time during which a locomotive is kept out of service during the successive steps of blowing off, cleaning, and refilling; the advantageous conservation and utilization of all heat units contained in the boiler; the conversion and use of the blown-off water for washing and refilling; the maintenance of a proper temperature of the water to be used for washing, as well as that to be used for refilling; the former to take into account the prevention of fractures in the boiler, the latter the saving of time in again generating the steam for operation of the locomotive; automatic regulation and control of the various steps to be taken to insure certainty of temperatures and economy in operation.

The state of the art is pertinent, particularly in view of claim 11, which both parties conceive to be fundamental, because of complainant's contention that through it the distinct advance is made for conserving for use in locomotive practice all of the heat units contained in a locomotive boiler. Upon this, a reference to the declared objects sought to be attained by other inventors is instructive, and in most instances quite responsive to defendant's claims respecting want of novelty and aggregation. Thus, Robb, in his patent (343,921) declared his object to be a device "by which a locomotive boiler may be washed out immediately after it enters the roundhouse, without waiting until it has cooled down; and it consists essentially of a water tank placed in the roundhouse or in proximity thereto, supplied with water from the ordinary source, and connected to the sand furnace or other heating furnace located in the roundhouse, and which may be utilized for the purpose of warming the water in the tank aforesaid," etc. So McKeen (patent 791,358, May 30, 1905) sought to "supply mechanism which can handle and dispose of the heated water and steam blown off from boilers, particularly locomotive boilers, for certain useful purposes such as the roundhouse or other buildings." Raymer, patents 757,839 and 788,376 (the one for a method; the other for the mechanism), while doubtless striving to meet the problem of conserving heat units, declared his object to be the "cleaning of the boilers and the restoration of service conditions without the loss of all the thermal units present in the boiler when the locomotive reaches the roundhouse," etc.

These references, relied upon by defendant to sustain the defense of aggregation and noninvention, are here noted for the purpose of show-

ing that the art, at the time these patents were respectively issued, disclosed no structure capable of conserving all the heat units for re-use in locomotive practice. That such achievement would be desirable is, of course, suggested; and it cannot be gainsaid, if attained, it would be accorded a dignity such as inheres in invention. As against the defendant here its own estimate of such achievement (which it claims for its alleged infringing structure) is significant. It circularized the trade in this language:

"It is probable that not another roundhouse will be built without a washout system, and old ones are being equipped as rapidly as possible. You, of course, are interested, and we would be pleased to make you a proposition for a hot water washout and water changing plant, an installation that will utilize all blown-off water and steam for heating and refilling and washout water, enabling you to fill with hot water all locomotives preparing to leave the roundhouse."

This is persuasive, as showing not only defendant's estimate of a structure embodying such feature, but equally that such feature was new; that is, the language practically asserts defendant's discovery, and therefore, as against it, the issue is really narrowed to a consideration of complainant's claim that the Gale structure conserves all the heat units. It may be true that in his specifications and claims he did not expressly assert that all the heat units were conserved; but that such was the object he intended to attain is quite clearly stated, and if the patent structure is capable of producing that result he is entitled to the protection of the patent laws.

That the Gale structure called for by claim 11 does accomplish the object of conserving the heat units is believed to be shown by the record in the case. Equally does it appear that no other structure had sought or succeeded in attaining that object. True, if Gale's structure be taken in sections, one part of it assigned to the function of blowing off, the other to refilling, another to washing out the boiler, the prior art furnishes devices capable of discharging these several functions—some of them quite the equivalent of a particular portion of the Gale device. But no one discloses a combination organization ordered with respect to this fundamental purpose of conserving all the heat units in the interest of economical, safe, and expeditious handling of a locomotive; and a reading of the claims with the specifications shows quite plainly that it contemplates blowing off the steam and water together, the separation of steam from the water before cooling action occurs, and the saving and reusing of the blow-off water —all in view of the use of the steam to provide a temperature of water for the several co-operative or successive functions of washing and refilling. As against the defense of aggregation, claim 11, with the ancillary claims 1, 2, 3, 6, 7, 9, and 12, ought in my judgment to stand. If in view of the result accomplished, it can be said that invention is lacking, then it is difficult to see how any of the prior art patents can stand a like test. That may not be a good reason for sustaining Gale's claims, but it would make the presumption of validity of a patent quite a negligible factor. It may be noted here that defendant's exhaustive discussion of the claims and the prior art structures, particularly McKeen's and Raymer's, proceeds first upon the

practical concession that Gale's structure does conserve the heat units, and, secondly, upon the possibility—through more or less reorganization and addition—of having these prior art structures accomplish this fundamental object. If McKeen, in 1905, exercised invention when he supplied a mechanism for disposing of the blow-off water and steam in heating the roundhouse, it would seem that he who conceived and produced a mechanism for utilizing them in promoting the safe, expeditious, and economical use of locomotive boilers was something more than a mechanic.

The conclusion is therefore reached that the patent, as it calls for a structure embodying the fundamental conception, and accomplishing the object of conserving substantially all the heat units, is valid as to the claims in the group first above noted. And in view of the conclusion reached upon the question of infringement, detailed consideration of the remaining claims is unnecessary. With respect to claim 16, which introduces the circulating line into the combination of the apparatus, it may be conceded that it was known; but its use by Gale in its structure appears to be novel in roundhouse equipment. This and all the remaining claims are, in my judgment, sustainable as embodying novel and highly useful ancillary features of his main invention. They all relate, directly or indirectly, not only to the conservation, but to the prudent utilization, of the blow-off product in an organization which as a whole accomplishes new results in so-called locomotive practice. The circulating line of claim 16, the thermostatic control of temperature and pressure, are novel features in themselves important contributing factors in bringing about the ultimate result; and they therefore severally present patentable combinations.

The real controversy in the case respects the validity of the patent. Defendant's structure responds substantially to all of the claims—certainly to those which the parties regard as basic—of the latter. Claims 11, 12, 16, 19, 20, 21, 23, and 24 are concededly infringed.

A decree for the complainant may be entered.